**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JULIE A. SU**, Acting Secretary of Labor, United States Department of Labor, <br><br> *Plaintiff,* <br><br> v. <br><br> **APEX MANAGEMENT GROUP I, INC.** and **JEFFREY BEMORAS**, <br><br> *Defendants.* | CIVIL ACTION <br><br> Case No. 1:24-cv-03609 |

## COMPLAINT

Plaintiff Julie A. Su, Acting Secretary of Labor, U.S. Department of Labor ("Secretary"), alleges as follows:

### PRELIMINARY STATEMENT

1. Defendant Apex Management Group I, Inc. ("Apex") creates and sells "Minimum Essential Coverage" healthcare plans ("MEC plans") to businesses across the country to provide healthcare coverage to their employees. The MEC plans cover basic medical services that meet the minimum coverage requirements of the Affordable Care Act and ERISA. Through Apex, these employers establish and adopt self-funded employee welfare benefit plans (each a "Participating Plan"), in which all medical claims are supposed to be funded through the financial contributions of the employers and its employees.

2. Apex sets the MEC plans' contribution rates. Instead of setting rates based on the amount needed to fund medical claims and administrative costs, Apex prices the MEC plans at low levels that are marketable to small employers. Because these contribution rates are artificially low, after paying fees to Apex and other service providers, many Participating Plans,

predictably, do not have enough funds left to pay all their medical benefit claims. The issue is compounded by Apex's failure to disclose its own fees, which are excessive for the services it renders to the Participating Plans.

3. The proper solution to this funding shortfall is simple: a self-funded plan is responsible for paying all claims, so Apex should seek additional contributions from the employers to cover the unfunded benefit claims.

4. Instead, Apex—through its principal, Defendant Jeffrey Bemoras ("Bemoras")—has directed its third-party administrators to pay the claims of underfunded Participating Plans with the funds of *other, unrelated* Participating Plans.

5. By offering or providing medical benefits to the employees enrolled in the Participating Plans, Apex operates as a multiple employer welfare arrangement ("MEWA"). Apex and Bemoras exercise discretion and control over the MEWA and are ERISA fiduciaries to each Participating Plan. By engaging in prohibited transactions, failing to follow Participating Plan documents, and causing Participating Plans to pay undisclosed and excessive fees, Apex and Bemoras have breached their fiduciary duties and violated ERISA.

6. The Secretary now brings this action to remedy these fiduciary breaches and prohibited transactions, make whole the Participating Plans harmed by Apex and Bemoras's actions, and prevent Apex and Bemoras from further harming the Participating Plans.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8. Venue is appropriate in the Northern District of Illinois, Eastern Division, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Participating Plans are

administered by Apex in Oak Brook and Western Springs, DuPage and Cook County, Illinois, within this district. In addition, the alleged violations occurred within this district.

**PARTIES**

9.      The Secretary is charged with enforcing the provisions of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*, which establishes, among other things, standards of conduct, responsibility, and obligations for fiduciaries of employee benefit plans. The Secretary has the authority to seek relief under ERISA §§ 409 and 502(a)(2) and (5), 29 U.S.C. §§ 1109 and 1132(a)(2) and (5), to restore plan losses, to recover unjust profits, and to obtain other remedial and equitable relief. The Secretary may also seek to enjoin a breaching fiduciary from acting as a fiduciary or service provider to employee benefit plans in the future. 29 U.S.C. § 1109(a).

10.      Defendant Apex is an Illinois-registered corporation and maintains offices in Oak Brook and Western Springs, Illinois, including at 1520 Kensington Road, Suite 106, Oak Brook, Illinois 60523. Apex began operations in June 2015.

11.      Defendant Jeffrey Bemoras owns 50% of Apex and is integrally involved in virtually all aspects of the business.

12.      Bemoras handles all technical aspects and relationships with plan clients and service providers for Apex. He is responsible for developing plan products, contracting with service providers, and managing all business activities with respect to Apex's products. Bemoras, on behalf of Apex, selects and retains Third Party Administrators ("TPAs") to administer the Participating Plans and directs the TPAs in their administration of the Participating Plans. Bemoras exercises authority and control over Participating Plan assets and management of the Participating Plans.

## GENERAL ALLEGATIONS

13.     Apex and Bemoras operate a multiple employer welfare arrangement (the "Apex MEWA") to provide health and welfare benefits to employer-sponsored, ERISA-covered employee benefit plans. As of December 31, 2021, the Apex MEWA serviced 737 Participating Plans, representing 11,772 members. Upon information and belief, the Apex MEWA continues to service a similar or higher number of Participating Plans and members. As set forth more fully below, Apex and Bemoras are fiduciaries with control over the plan assets and management of the Participating Plans, each of which is an ERISA-covered employee benefit plan participating in the Apex MEWA.

14.     The Apex MEWA is established and maintained for the purpose of offering or providing covered benefits to the members of the Participating Plans, each of which is an employee welfare benefit plan under ERISA. 29 U.S.C. § 1002(1), (40)(A). There is no evidence of common control among the participating employers, nor any cohesive bond. Participating employers are heterogeneous and unrelated, with their only common purpose being a shared desire for health benefits provided through Apex-developed plans.

15.     The Participating Plans are established for the benefit of each sponsoring employer's employees. The plan documents for each individual Participating Plan represent that each is a self-funded or self-insured health care plan. They clearly define the intended benefits for specific beneficiaries—namely, medical benefits for covered employees of each employer and, where applicable, their family members. Each Participating Plan is financed through contributions collected from employees and/or employers. When sponsoring employers transfer employee and employer contributions to the TPAs servicing the Participating Plans, it is the sponsoring employer's intent that these contributions are to be used to pay claims and necessary

4

and reasonable administrative expenses. Employer and employee contributions are therefore assets of the Participating Plans.

16. Through the facts described in Paragraphs 14 and 15, each Participating Plan constitutes an employee welfare benefit plan covered by ERISA, pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a).

17. The Participating Plans obtain medical benefits for participating employees through their arrangement with the Apex MEWA.

18. Each Participating Plan is established through an Adoption Agreement signed by a representative of the sponsoring employer and by Apex.

19. Apex and Bemoras select and retain TPAs to administer the Participating Plans in the Apex MEWA. Each of the Participating Plans at issue in this lawsuit is or at relevant times was administered by one or more of three TPAs: Verdegard Administrators, LLC (formerly Hawaii Mainland Administrators, LLC) ("HMA"); Regional Care, Inc. ("RCI"); or a combination of HMA and DWS Holdings, d/b/a Pinnacle Peak Administrators ("Pinnacle").

20. Apex and Bemoras execute an administrative service agreement ("ASA") with each TPA that instructs the TPA how to administer the Participating Plans assigned to that TPA. The ASAs generally provide that Apex is the "Employer," "Client," or "Plan Sponsor" (rather than any individual employer); that Apex has the responsibility for communicating with Participating Plan participants and ensuring funding; that Apex has authority to terminate the TPA's services; and that Apex is the plan administrator for purposes of ERISA. The ASAs also set an administrative fee payable to the TPA out of Participating Plans' contributions.

21. Apex and Bemoras each exercise authority or control with respect to management or disposition of assets of the Participating Plans in the Apex MEWA, exercise discretionary

authority or discretionary control over the management of the Participating Plans in the Apex MEWA and the Apex MEWA itself, and have discretionary authority or discretionary responsibility in the administration of the Participating Plans and thus are fiduciaries of each of the Participating Plans pursuant to ERISA § 3 (21)(A), 29 U.S.C. § 1002(21)(a).

## COUNT ONE

### *Unlawful Transfers and Use of Unrelated Participating Plans' Assets*

22. Paragraphs 1 through 21 are incorporated by reference.

23. Sponsoring employers of the Participating Plans remit payments to the TPAs assigned by Apex. The payments are composed of employer and/or employee contributions.

24. Bemoras, on behalf of Apex, sets the Participating Plans' contribution rates. Bemoras does not use underwriting, risk profiles, likely utilization rates, or any actuarial analysis to set contribution rates, but rather sets them based on a market analysis of competitors' pricing. Contribution rates do not vary based on participant or employer and are rarely updated.

25. HMA and Pinnacle receive and retain all contributions for all Participating Plans they administer in a single pooled account. At the direction of Apex and Bemoras, HMA and Pinnacle pay service providers and Apex out of the single pooled account, transfer the remaining funds to a commingled claims funding account, and pay claims of all Participating Plans from it.

26. RCI receives and retains all contributions in separate accounts for each Participating Plan it administers. At the direction of Apex and Bemoras, when a Participating Plan administered by RCI has inadequate funds to pay its claims, RCI transfers assets of other, unrelated Participating Plans—including both active and terminated Participating Plans—to the claims funding accounts of the underfunded Participating Plans and uses those funds to pay the claims. Bemoras has expressly directed RCI to make these transfers, orally and in writing. Bemoras has represented to RCI that he and Apex have the authority to approve these transfers

6

between Participating Plans' accounts. Bemoras set specific requirements for when RCI needed to seek his permission to make transfers between Participating Plan accounts. For instance, from at least September 2018 until March 2020, Bemoras reviewed and approved all transfers. In around March 2020, Bemoras gave RCI a blanket approval to make any transfer between Participating Plan accounts of less than $1,000, while requiring express approval for higher transfer amounts.

27.     If a Participating Plan lacks sufficient funding to pay its claims, its plan documents require Apex to seek additional contributions from the sponsoring employer to cover the claims of that Participating Plan. But Apex rarely, if ever, does so. Instead, it uses the funds of unrelated Participating Plans to pay those claims.

28.     Upon termination of a Participating Plan, in some cases the Participating Plan documents require Apex to refund any unspent funds of the Participating Plan to its sponsoring employer. Apex has rarely refunded unspent funds. In most cases, the unspent funds of terminated Participating Plans remain in accounts administered by the TPAs. Apex and Bemoras control and direct the use of these funds, including to pay claims of unrelated Participating Plans.

29.     From at least April 2018 through December 2020, HMA, Pinnacle, and RCI serviced Participating Plans that had not contributed sufficient money to pay all the claims made by the plans' participants and beneficiaries, resulting in claims funding deficits for those Participating Plans.

30.     At the direction of Apex and Bemoras, HMA and Pinnacle paid the claims of underfunded Participating Plans out of the commingled claims accounts.

31. At the direction of Apex and Bemoras, RCI transfers plan assets of terminated and active Participating Plans to pay the claims of Participating Plans that do not have sufficient funds to pay claims.

32. At the direction of Apex and Bemoras, in 2021, HMA transferred a lump sum of plan assets of 91 Participating Plans to Apex. A representative of Apex corresponded via email with HMA to effectuate this transfer, including requesting financial information regarding the affected Participating Plans and instructing HMA to execute the transfer, under the purported authority of Bemoras. This lump sum transfer represented the pooled plan assets of Participating Plans for whom Pinnacle assumed administrative responsibilities for financial functions. Some of the 91 Participating Plans had negative account balances at the time of the transfer. Those negative balances were offset by the positive account balances of the remaining Participating Plans. This resulted in the effective transfer of plan assets from the positive Participating Plans to the negative Participating Plans. Apex subsequently transferred the funds to Pinnacle, which began to administer those Participating Plans.

33. Through these actions, from at least April 2018 through December 2020, Apex and Bemoras directed and caused the transfer of more than $2.7 million from Participating Plans to pay the claims of unrelated Participating Plans. On information and belief, Apex and Bemoras have continued to direct and cause additional such transfers between unrelated Participating Plans after that period.

34. To protect plan investments, ERISA requires that those who manage the investments act solely and exclusively in the interests of plan participants. ERISA § 404(a)(1)(A), 29 U.S.C. 1104(a)(1)(A).

35.     ERISA § 404(a)(1)(D) requires fiduciaries to act "in accordance with the documents and instruments governing the plan" to the extent that they are consistent with ERISA's other provisions. 29 U.S.C. § 1104(a)(1)(D).

36.     ERISA § 406(b)(2) prohibits fiduciaries from having conflicting interests in a transaction or acting on both sides of a transaction, 29 U.S.C. § 1106(b).

37.     Through their actions and omissions alleged in paragraphs 22 through 36, Apex and Bemoras:

    a.      Failed to act solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of Plan administration in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

    b.      Failed to act in accordance with the documents and instruments governing the plan in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

    c.      Acted on behalf of a party whose interests are adverse to the interests of the Plan or the interests of its participants and beneficiaries in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

38.     As a direct and proximate result of the fiduciary breaches of Apex and Bemoras and the prohibited transactions they engaged in, the Participating Plans suffered injury and losses for which they are personally liable and subject to appropriate equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

## COUNT TWO

### *Commingling of Participating Plan Assets Contrary to Plan Documents*

39.     Paragraphs 1 through 38 are incorporated by reference.

40. The Adoption Agreements of the Participating Plans state that Apex has established a "Segregated Trust/Bank Account for Employer for the purpose of the administration and funding of the" Participating Plan.

41. At Apex's and Bemoras's direction, HMA and Pinnacle receive and retain all employer and employee contributions in a single pooled account, despite the language in the Adoption Agreements between Apex and the sponsoring employers that provides for segregated trust/bank accounts to be established for each Participating Plan.

42. ERISA requires that those who manage plan assets to act solely and exclusively in the interests of plan participants. ERISA § 404(a)(1)(A), 29 U.S.C. 1104(a)(1)(A).

43. ERISA § 404(a)(1)(D) requires fiduciaries to act "in accordance with the documents and instruments governing the plan" to the extent that they are consistent with ERISA's other provisions. 29 U.S.C. § 1104(a)(1)(D).

44. Through their actions and omissions alleged in paragraphs 40 through 43, Apex and Bemoras:

    a. Failed to act solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of Plan administration in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

    b. Failed to act in accordance with the documents and instruments governing the plan in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

45. As a direct and proximate result of the fiduciary breaches of Apex and Bemoras, the Participating Plans suffered injury and losses for which they are personally liable and subject to appropriate equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

10

**COUNT THREE**

*Causing Participating Plans to Pay Undisclosed and Excessive Compensation to Apex*

46.     Paragraphs 1 through 45 are incorporated by reference.

47.     Each Participating Plan pays Apex a fee of between $10 and $15 per employee, per month ("PEPM"). This fee is paid out of the employee and employer contributions used to fund each Participating Plan.

48.     Bemoras sets the fee for each Participating Plan.

49.     Apex's fee is not disclosed to Participating Plans or their sponsoring employers or participants.

50.     Between at least February 1, 2017, and March 31, 2022, Apex collected millions of dollars in undisclosed compensation from Participating Plans. Upon information and belief, Apex continues to collect $10 to $15 PEPM from each Participating Plan.

51.     To protect plan investments, ERISA requires that those who manage the investments act solely and exclusively in the interests of plan participants. ERISA § 404(a)(1)(A), 29 U.S.C. 1104(a)(1)(A).

52.     ERISA § 406(b) prohibits fiduciaries from using plan assets for their own benefit, 29 U.S.C. § 1106(b).

53.     Through their actions and omissions alleged in paragraphs 47 through 52, Apex and Bemoras:

   a.     Failed to act solely in the interest of the participants and beneficiaries of the Participating Plans and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of

11

Participating Plan administration in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

b. Dealt with Participating Plan assets in their own interest or for their own account, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

54. As a direct and proximate result of the fiduciary breaches of Apex and Bemoras and the prohibited transactions they engaged in, the Participating Plans suffered injury and losses for which they are personally liable and subject to appropriate equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, the Secretary asks that this Court enter a judgment:

A. Permanently removing Apex and Bemoras as fiduciaries, service providers, trustees, and administrators of the Participating Plans and the Apex MEWA and permanently enjoining them or anyone acting on their behalf, including their officers, agents, employees, assigns, subsidiaries, affiliates, service providers, accountants, attorneys, and any other party acting in concert with them or at their direction, from serving as fiduciaries of the Participating Plans and the Apex MEWA;

B. Requiring Apex and Bemoras to provide immediate notice to all participants of Participating Plans, in a form approved by the Secretary, that informs participants that the Apex MEWA may be underfunded and that there is a significant risk that medical expenses will not be reimbursed even if an expense is covered by the Participating Plan;

C. Ordering reversal of the prohibited transactions described in Counts One and Three and disgorgement of profits gained by Apex and Bemoras as a result of the prohibited transactions;

D.      Requiring Apex and Bemoras to commission an accounting of the Apex MEWA, including all Participating Plan assets, conducted by a qualified independent third party at Apex's and Bemoras's expense;

E.      Appointing an Independent Fiduciary to the Participating Plans with full and exclusive fiduciary authority over their administration and management, and full and exclusive control over the Apex MEWA and Participating Plans' assets, including, but not limited to:

    i.      Authority to exercise all fiduciary responsibilities relating to the Apex MEWA and Participating Plans;

    ii.      Authority to take exclusive control of all plan assets of the Apex MEWA and the Participating Plans;

    iii.      Authority given to trustees under the terms of the documents governing the Apex MEWA and Participating Plans;

    iv.      Authority to amend the documents governing or relating to the rights and obligations of the Apex MEWA, Apex, or Bemoras, with respect to any Participating Plan, with prior notice to the Court and parties;

    v.      Authority to notify Participating Plans' participants about underfunding of the Apex MEWA and any risk that medical expenses will not be paid even if covered by the Participant Plan;

    vi.      Authority to commission an accounting of the Apex MEWA, including all Participating Plan assets, conducted by a qualified independent third party at Apex's and Bemoras's expense;

    vii.      Exclusive authority to appoint, replace and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers as the Independent

Fiduciary shall, in the Independent Fiduciary's sole discretion, determine as necessary to aid the Independent Fiduciary in the exercise of the Independent Fiduciary's powers, duties, and responsibilities to the Apex MEWA and Participating Plans;

viii.    Authority to conduct an accounting of all medical claims and negotiate all medical claims;

ix.    Authority to terminate the Apex MEWA or Participating Plans, if in the best interest of the Apex MEWA or Participating Plans and, in that event, to establish a claims submission deadline, and to adjudicate all claims filed by such deadline, and to deny claims not filed by the claims submission deadline;

x.    Authority to adjudicate and pay or deny any and all claims submitted to the Apex MEWA or Participating Plans and to re-adjudicate all claims denied by the Participating Plans in connection with the foregoing violations of ERISA and its regulations;

xi.    Authority to pursue recovery of monies owed and due to the Apex MEWA or Participating Plans from all people obligated to make such payments under the terms and conditions of the Apex MEWA and Participating Plans;

xii.    Authority to identify and pursue recovery of Apex MEWA and Participating Plans' assets as well as all monies to which the Apex MEWA or Participating Plans have a right of recovery;

xiii.    Authority to identify and pursue claims on behalf of the Apex MEWA and Participating Plans;

14

xiv.  Except as provided herein, the authority to retain such persons and firms as may reasonably be required to perform their duties hereunder, including but not limited to administrators, trustees, attorneys, employees, assigns, agents, and service providers. The Independent Fiduciary may not, however, delegate the authority to appoint, replace, and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers, or the responsibility to monitor the activities of the Apex MEWA and Participating Plans' trustees, attorneys, agents, and service providers;

xv.  Authority to make all required filings, including Form M-1; and

xvi.  Authority to seek payment of reasonable and necessary fees for their services from the Apex MEWA and Participating Plans' assets, with prior notice to the Court and parties, and to pay the reasonable and necessary fees of service providers;

F.  Requiring Apex and Bemoras to provide to the Independent Fiduciary all documents, records, accounts or other information required to administer and manage the Participating Plans;

G.  Requiring Apex and Bemoras to jointly and severally restore all losses, including interest, they caused to the Participating Plans;

H.  Requiring Apex and Bemoras to jointly and severally make equitable restitution to the Participating Plan's participants of all losses resulting from their fiduciary breaches, including interest;

I.  Requiring Apex and Bemoras to jointly and severally reimburse the fees and expenses of the Independent Fiduciary to the Apex MEWA and the Participating Plans;

15

J.       Permanently enjoining Apex and Bemoras or anyone acting on their behalf, including their principals, officers, directors, owners, agents, assigns, or subsidiaries, from ever acting as a fiduciary or service provider to any plan covered by Title I of ERISA and from marketing or enrolling any employers, professional employer organizations, or participants in any ERISA or non-ERISA covered health plan or any plan purporting to provide any type of medical benefits;

K.       Awarding the Acting Secretary her costs incurred in this civil action; and

L.       Granting such other relief as may be equitable, just, and proper.

**SEEMA NANDA**
Solicitor of Labor

**CHRISTINE Z. HERI**
Regional Solicitor

s/Benjamin R. Salk
Elisabeth P. Nolte
Benjamin R. Salk
U.S. Department of Labor
Office of the Solicitor
230 S. Dearborn St., Room 844
Chicago, IL 60604
(312) 886-5260
nolte.elisabeth.p@dol.gov
salk.benjamin.r@dol.gov

*Attorneys for Plaintiff Julie A. Su, Acting Secretary of Labor, United States Department of Labor*

16